The present proceeding, which is one by rule, had its origin in a suit for separation, which was filed by the present plaintiff in rule, Mrs. Allen W. Tate, against her husband, John H. Tate, on October 15, 1936.
In her petition, filed at that time, she sought to obtain a separation from bed and board as well as a separation of the community property which had been acquired during their marriage. She set out that the community property consisted of 16 shares of stock of the Illinois Central Railroad, valued at $42, 15 shares of Homestead Stock (the name of the Homestead not being mentioned), valued at $600, 11 shares of Pan American Life Insurance Company, valued at $175, 1 bond, referred to as Slattery Proceed No. ___, valued at $675, 5 shares of Standard Life valued at $30 and a home in Kentwood, Louisiana, valued at $3,500. She asked that an inventory and appraisement of the property be made according to law and that an injunction issue restraining her husband from disposing or encumbering any of the said property during the pendency of the said suit. She also asked that she be paid alimony in the sum of $40 per month and that the sum of $150 for services of her attorneys employed to prosecute her suit be paid by her husband and also that she be given the care and custody of her minor child born of their marriage.
The court granted the order for an inventory which was duly taken by a Notary Public of Tangipahoa Parish and filed in the proceedings on October 21, 1936. In the inventory there appears listed as community property only the real estate, which evidently was the home referred to in plaintiff's petition, valued at $3,500, 15 shares of Security Homestead Stock, valued at $50 each, or $750, and 1 share I.C.R.R. stock, valued at $42. The total amount of the inventory therefore was $3,795.
The husband did not resist the suit for separation and accordingly on November 20, 1936, judgment was rendered against him, by default, decreeing a separation from bed and board between them and dissolving the community of acquets and gains. He was ordered to pay alimony in the sum of $40 per month and also $50 attorney's fees.
On February 14, 1939, plaintiff again appeared in the same proceeding and, on alleging that the $40 alimony per month which had been awarded her was not sufficient to take care of herself and her child in view of her ill health and necessitous circumstances, she asked that a rule issue against her husband to have him show cause why the alimony should not be increased to $75 per month. Her husband answered, denying the allegations made.
No trial of that rule seems to have been had nor was any action taken on it in court. We judge, however, from some of the testimony in the record, that plaintiff did subsequently receive $22.50 per month in addition to the $40, out of the rent received by her father-in-law from the home which belonged to the community, which seemed to have been placed in his charge and care. This however is not a matter at issue in the present proceeding.
On June 28, 1940, plaintiff again appeared in the proceeding and filed the present rule against her husband, John H. Tate, his father, E.T. Tate and the Security Homestead Association through its liquidator, C.E. Walker. In her petition she sets out all that had transpired up to that time and she then avers that at the time the inventory referred to was taken and filed, the community between herself and her husband owned, in addition to the property listed, 11 shares of Pan American Life Insurance Company stock, 1 bond Slattery Proceed No. ___ and 5 shares of Standard Life Insurance Company stock, at a total valuation of $880 and that as no mention was made of this property in the inventory, it should be amended so as to include those items. She then avers that at the time the said inventory was taken, there were no claims listed against the said property and there were no debts due by the community, but since that time, 15 shares of Security Homestead stock which had been listed in the inventory have been illegally transferred to E.T. Tate, notwithstanding the injunction that was standing in the suit and that there has been paid to the said E.T. Tate, the sum of $335 as a stock dividend on the said stock, all without an order of court and without authority in law.
She then avers that the said homestead stock belonged to the community, that she had never transferred her interest to anyone, nor was there any pledge or mortgage *Page 508 
bearing on it, for any loan standing against it, and that it was therefore illegally transferred to the said E.T. Tate, all of which cannot affect her one-half interest therein and that she therefore desires to have the same returned to the community or in the alternative that she recover judgment against the said E.T. Tate and the Security Homestead Association for the sum of $750, being the amount of its value as listed in the inventory, with interest at the rate of five per cent. She asks therefore that a rule issue against the said John H. Tate and E.T. Tate and the Security Homestead Association ordering them to show cause why the relief she asks for with regard to the said stock should not be granted and she further asks that the rule also order the said E.T. Tate and John H. Tate to show cause why the inventory heretofore taken of the community property should not be amended so as to include therein the property which was omitted therefrom, valued at $880.
In answer to the rule, the defendant E.T. Tate appeared through his counsel and admitted that the community was the owner of the property omitted in the inventory at the time the inventory was taken, but he avers that all of the said property had before then been pledged and delivered to him in order to secure an indebtedness due him by the community amounting to approximately $3,000. That said indebtedness was represented by monies loaned to John H. Tate during the marriage, for taxes paid on the property, for insurance premiums paid on insurance policies and other items, and that as security therefor the said John H. Tate, acting in his capacity as head of the community, had pledged and delivered to him all of the property mentioned as having been omitted from the inventory. He further sets out that he sold the Slattery bond and credited the amount against the indebtedness and that he had collected a liquidating dividend on the Security Homestead Stock of $25 per share for which he had also given credit, and that after allowing said credits, there was still due him the sum of $2,642 for the security of which he is holding the said property in pledge. He further avers that the said pledge having been effected before the filing of the suit for separation, is perfectly legal and valid and should be so recognized by the court. He further avers that he was never notified in any way about the taking of the inventory which is now complained of, that the same was taken by plaintiff in rule, without his assistance or knowledge, that she instructed the Notary as to what property was to be listed and that in no event therefore could he be held liable for the costs of this rule or for any amendment of the inventory in case the same is ordered by the court.
The defendant John H. Tate adopted the answer of the defendant E.H. Tate as his own. The Security Homestead Association filed an exception to the citation that was issued to it, which, it was agreed, should be sustained. Through the present State Bank Commissioner, the liquidator of said Homestead Association, a motion to dismiss the appeal as far as it is concerned, has been filed in this court but in view of the fact that there seems to be no judgment affecting that defendant and that as a matter of fact it was dismissed from the proceeding by consent of counsel for want of citation, we do not know that it is necessary for us to consider that motion unless, it be to make mention of what has taken place and to state that there seems to be no objection to its dismissal from the case, at the present time.
As between the plaintiff in rule and the other two defendants, there seems to be no dispute as to the law that has to be applied and therefore the question to be decided has resolved itself into one of fact. The trial court rendered judgment in favor of the plaintiff in rule, making the same absolute. It ordered that the 11 shares of Pan American Life Insurance Company stock valued at $175, the Slattery Bond, valued at $675, 5 shares of Standard Life Insurance Company stock valued at $30 and 15 shares of Security Homestead Association stock valued at $15 be placed on the inventory as community property. From this judgment both the defendants in rule have taken an appeal.
There is hardly any doubt that Mr. Tate has shown that he advanced his son and the latter's wife, during their early marriage, the sum of $2,000, which was used by them in the payment of their home. Plaintiff admits that he did advance a large part of that amount but claims that they had considerable money of their own to pay on the home and therefore the amount advanced was far less than $2,000. Even then, it is shown that the home was valued at $3,500 when the inventory was taken and no doubt was worth that much or probably more, when it was bought. John H. Tate, the husband, in his testimony *Page 509 
states that he and his wife had about $700 at the time. Even therefore, if they had a $1,000 of their own and the home was valued at $3,500, it is still possible that Mr. E.T. Tate did advance them $2,000, as he claims, and as appears clearly to be proven by the four checks of $500 each which are filed in the record. Mr. Tate, as we understand, is or was a banker in Kentwood and his son worked in the bank. His explanation is that his son wanted to borrow the money from the bank and in order to save them the interest which they would have to pay on a loan, he agreed to advance them what they needed, without interest. He impresses us as a man of rather substantial means and in view of his relations with, and attention which he otherwise gave his son and daughter-in-law, it seems entirely plausible that he would want to favor them in this manner and that he did so. The fact that the checks are signed, "E.T. Tate per John H. Tate" is in line with Mr. Tate's testimony that his son had access to his checking account and we do not think that that in any way affects the integrity of the testimony that this was a bona fide loan made for the purpose for which Mr. Tate said it was made. It appears that the perforation on one of the checks shows that it was paid as of the year 1940. Counsel for plaintiff in rule seems to have built the greater part of their argument on this circumstance to show that the whole matter is one of collusion between this father and son. The argument is not persuasive however as on that same check there is a stencilled stamp mark, the same as on the others, showing payment in 1930, presumably at the time it should have been made, and besides, it is shown that it would have been impossible for the perforation to have been validly made in 1940, because that was after the Kentwood Bank had been merged with another bank and no longer operated as such.
On the first item charged by Mr. Tate, therefore, we think that the testimony is sufficiently convincing, and we may now consider the other items which he claims he advanced.
First he listed on his statement $500 representing interest on the $2,000 loan, being five per cent per annum for five years. Whilst it is true that his object in making the loan was to save them any interest, we must consider the difference in the circumstances and the relation existing between the parties at that time, and those existing after the rule was taken against him. At that time he had done considerably more than this to show his care and solicitude for his son and daughter-in-law and no doubt was sincere in saying that he wanted to save them the conventional rate of eight per cent on the loan. What he is charging now, after the relation between them has become strained, is the legal rate of five per cent. But be all that as it may, the question of this charge might be entirely overlooked and still the balance due him would be in excess of the value of the pledged security he held, granting of course, that the pledge is valid.
The next item appearing on the statement is a charge of $65 advanced by Mr. Tate in June, 1936, for the purpose of paying Mrs. John Tate's expenses in coming home from Ashville, where she had gone for her health. That clearly is a debt that was due him by the community.
Next he charges the sum of $201.03 for Parish and State taxes paid by him and also the sum of $102.77, for redemption of their property after a tax sale. He also charges $68.20 for four years taxes to the Town of Kentwood. All these are community debts also.
He next charges the sum of $330 for premiums paid by him on insurance policies held by John H. Tate. Those policies, it appears from the testimony, are now made in his favor, as the beneficiary, and it may be that there is some question as to whether that was a community debt or not.
The last item he charges is the sum of $50 paid by him to Mr. R.F. Walker, who was Mrs. Tate's attorney in the separation suit. Under the jurisprudence of this State that is undoubtedly a community debt.
His statement therefore shows a total indebtedness of $3,317 against which he gives credit for the proceeds of the Slattery bond held by him in the amount of $300, also the sum of $225, liquidating dividend on the homestead stock and $150 for dividends on the same stock. The total credits amount to $675 and the balance that he claims as still due him is $2,624. Let us say for the sake of argument, that the interest charge of $500 and the premium payments on the insurance policies of $330 were not community obligations and *Page 510 
that they should be deducted from the balance of his claim, and we see that that would still leave him due the sum of $1,812, or far more than the value of whatever security he may hold in pledge, as he claims.
The next important question therefore is to determine whether he held the security as pledgee for the amount he had advanced, prior to the date on which the judgment of separation was rendered on November 20, 1936.
From Mr. E.T. Tate's testimony and also that of his son, there can be but little doubt that he did hold these securities prior to that date and the only contradiction arises from the insinuation that because of the relation of father and son that existed between them, it was easy for them to concoct such testimony. An attempt is also made to disprove Mr. Tate's testimony by certain statements which are referred to in several letters written by him to his daughter-in-law, after the judgment of separation, but an analysis of these letters and some of their contents would tend rather to corroborate his testimony. For instance, in his letter of April 26, 1936, in answer to her request for information concerning the Slattery bond, he tells her about his having been swindled in a sale of that bond along with some of the same bonds he held himself, at a time which he says was "some three or four years since." Even three years before the date of that letter would take us back to April, 1933, and it would seem therefore that he was holding that bond at that time. By reference to his testimony on this same matter, we find that after learning that he had been defrauded in the transaction, he finally recovered some of the money and he speaks of having gotten a part of it back, as shown by a letter from his attorney in New Orleans who was handling the matter for him, and which letter is dated November 10, 1936. Again, in his letter to Mrs. Tate of May 11, 1939, he speaks of this bond having been lost in the manner referred to before the separation of property between herself and her husband and further he tells her that what he received "was spent for her and John."
What is contained in all of his letters impresses us as having been an earnest effort on his part to try to make the best of what had come about as an unhappy situation between his son and daughter-in-law and his loss at times, to be able to recall everything in connection with their business, because, as he frequently stated it has been so long since, is quite understandable.
In one part of his testimony, in discussing the homestead stock, he referred to a letter which he says he can produce, showing that he had deposited that stock in New Orleans in 1936; the letter he referred to is apparently dated February 4, 1936. If that was the time when he deposited the stock, evidently it was in his possession, and that was several months before the judgment of separation or even before the suit was filed.
Whilst it does not appear that a formal act of pledge was executed, the inference to be drawn from all that happened, and the presumption arising out of Mr. Tate's possession of the securities, seem to point to the fact that he was holding them in the capacity of and as pledgee. Undoubtedly, his son, as head and master of the community, had the right to pledge them to him for the amount which was due by the community, no other formality than the actual delivery of the securities being necessary. R.C.C. Art. 3158. Moreover, with regard to what stock had to be transferred by endorsement, the proof in the record is that John H. Tate did make the proper endorsements.
There is, as contended by counsel for the plaintiff in rule, some discrepancy in the testimony of Mr. Tate and his son, but rather than involving them in any collusion, it would seem to stress the honesty with which they gave whatever facts they could recall to the court. Certainly neither of them can be charged with having attempted to fraudulently conceal the securities from the inventory as neither had anything to do with the ordering and the taking of that inventory in October, 1936. Mrs. Tate says something about having requested E.T. Tate to furnish her with a list of securities and that he refused or neglected to give it to her, but this Mr. Tate says is not so.
The testimony otherwise shows Mr. Tate to have been very kind to his daughter-in-law. Far more kind indeed and considerate than was her husband whose duty it was to provide for her as his wife when she remained at a hospital in Ashville, for a period of four years. Had it not been for Mr. Tate, it is doubtful that she would ever have been able to have the benefit of the treatments she obtained there. There *Page 511 
is no reason to doubt Mr. Tate's statement when he says that he paid on an average of over $50 per month while she was staying in the hospital. She attempted to show that her husband was able to pay for her expenses but on the salary he was receiving, and on the basis of her own complaint in her suit for separation that he was attentive to another woman while she was away, we can hardly understand how he could have afforded to do so. He was receiving $100 a month when she first went to Ashville, and afterwards his salary was reduced to $75 a month. In this connection, it may be well to note that Mr. Tate is making no claim whatever for the amounts so paid by him.
Our conclusion is that as a question of fact on the point of the indebtedness to Mr. Tate by the community, and his holding of what securities he had as pledgee, the case is with the defendants in rule. The plea of prescription which has been urged against Mr. Tate's claim cannot be sustained if the pledge is maintained for the reason that prescription does not run against a pledgee as long as he holds the pledged property in his possession. Waterman v. Dupeire, 180 La. 320, 156 So. 405.
We therefore hold that the pledge did exist, but nevertheless, it would seem that plaintiff in rule is entitled to have the securities omitted from the inventory included therein as admittedly they were community property. They will be listed and appraised subject to the pledge.
Since the Slattery bond and the Security Homestead stock have been disposed of, they naturally cannot be included in the inventory but they should also be appraised and their appraised value included in the amount of the inventory, the whole of which is to form the basis of the separation of the community subject to the rights of E.T. Tate as pledgee.
For the reasons stated, the judgment appealed from is amended and recast so as to read as follows:
It is ordered that the rule herein taken by the plaintiff, Mrs. Allen W. Tate, be, and the same is hereby made absolute, and it is further ordered that the inventory taken by Herbert Broyles, Notary Public for the Parish of Tangipahoa, on October 19, 1936, be amended so as to have included and appraised therein, subject to the rights of pledge of E.T. Tate, the following property forming part of the community of acquets and gains formerly existing between the said plaintiff in rule and defendant in rule, John H. Tate: Eleven (11) shares of Pan American Life Insurance Company stock and five (5) shares of Standard Life Insurance Company stock. It is further ordered that the appraised value of one (1) bond, Slattery Proceed No. ___ and the value of fifteen (15) shares of Security Homestead stock be also included in the said inventory, subject to the rights of pledge of the said E.T. Tate. All costs of this proceeding are to be paid out of the funds of the said community of acquets and gains upon the liquidation thereof.